UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**SCOTT BOSTWICK,**

        Plaintiff,

       -vs-                                            Case No. 13-C-1036

**WATERTOWN UNIFIED SCHOOL DISTRICT,
BOARD OF EDUCATION OF THE WATERTOWN
UNIFIED SCHOOL DISTRICT, KATE LAPIN,
CASSANDRA SCHUG, IVAN THOMPSON,
DOUGLAS KEISER, ROBERT BAXTER,
and PAUL VANCE,**

        Defendants.

---

## DECISION AND ORDER

---

After ten years as the principal of Watertown High School, Scott Bostwick was placed on administrative leave and eventually fired pursuant to what he claims was a trumped-up investigation designed to drive him into resignation or retirement. The defendants removed from state court, and now they move to dismiss portions of Bostwick's nine-count complaint. As discussed below, the defendants' motion is directed towards claims that arise under state law. The Court may exercise jurisdiction over these claims because they are supplemental to Bostwick's federal claims. 28 U.S.C. § 1367(a). The Court accepts the following, well-pleaded allegations in the complaint as true for purposes of this Rule 12(b)(6) motion. *Vill. of DePue v. Exxon Mobil Corp.*, 537 F.3d 775, 782 (7th Cir. 2008).

Bostwick was the principal of Watertown High School from May 2002 until

late September 2012. The Watertown Unified School District renewed Bostwick's contract five times. The most recent contract covered the 2011-12 and 2012-13 school years. During most of Bostwick's tenure, Douglas Keiser was Superintendent and Bostwick's immediate supervisor. Cassandra Schug became the District's new Superintendent for the 2011-12 school year.

Early in Schug's tenure as Superintendent, Bostwick heard rumors that she had plans to replace him and two other high profile senior administrators. Bostwick approached Schug about the matter and she assured him that she had no desire to replace him. Bostwick had reason to doubt the sincerity of Schug's assurances, so he requested a meeting to find out where he stood regarding retirement and benefit options. On February 17, 2012, Bostwick attended that meeting with Schug and Ivan Thompson, the District's recently-named Human Resources Director. Soon after the meeting began, Schug and Thompson advised Bostwick that they were investigating him for alleged age and sex discrimination against older female staff members. Schug and Thompson presented Bostwick with a retirement agreement and threatened him by indicating that if he did not sign it they would keep investigating, which would likely result in his termination. Bostwick denied engaging in any misconduct. Although Thompson told Bostwick it looked like he was guilty of the charges, Thompson and Schug refused to tell Bostwick what he was accused of doing. Bostwick later learned that a secret investigation against him had begun late in 2011.

For several months, Schug and Thompson continued refusing Bostwick's

requests for information regarding the allegations against him. Schug and Thompson then expanded their investigation, and on June 12, 2012, they presented Bostwick with a 27-page document entitled "Findings of Fact & Conclusions," detailing 42 things which Bostwick had allegedly done wrong over the course of his tenure at Watertown. None of these issues were registered as formal complaints, and most of them had never been brought to the attention of Bostwick or anyone in administration or human resources. Thirty-two of the 42 issues had nothing to do with age or sex discrimination.

Bostwick was then placed on administrative leave and banned from District property. Over the rest of the summer, Schug and Thompson continued revising their findings, conducting more interviews and adding allegations. For months during the summer of 2012, Bostwick tried to respond to the charges against him. Among other things, Bostwick met with Schug and Thompson for more than 10 hours over several days. Bostwick was not required to participate in these meetings. Rather, the District agreed to meet with him to get his side of the story in person only after multiple requests by Bostwick. Prior to that time, the District indicated that it was going to proceed with a final investigation report without his personal input. The District produced its last version of the findings on August 23, 2012, along with Schug's recommendation that the Board of Education of the Watertown Unified School District fire Bostwick. The Board scheduled a hearing for September 25-26, 2012.

Prior to receiving the first copy of the findings in June 2012, Bostwick sent a

letter directly to the Board, through its President Kate Lapin, detailing the harassment he was suffering at the hands of Schug and Thompson in connection with the investigation. On June 14, 2012, Bostwick followed-up with another letter directed to the Board which he identified as a "formal complaint" of harassment. Bostwick asserted that he was being harassed on the basis of his age by attempts to force him into retirement. Instead of conducting a hearing within thirty days, as required by Board policy, Lapin engaged Paul Vance to conduct a third-party investigation. In the course of his investigation, Vance communicated with Bostwick only once. Bostwick attempted to provide additional information to support his allegations of harassment. However, Vance ignored multiple attempts by Bostwick to communicate in the first half of September 2012. After promising that he would be willing to consider additional evidence, Vance simply stopped communicating with Bostwick's counsel. Vance reported his findings to Schug, Thompson, Lapin, and the Board in a closed door session on September 12, 2012, concluding that the investigation against Bostwick was completely justified, and that some or all of the 42 complaints against him were meritorious and credible. After the September 25-26 hearing, the Board voted to terminate Bostwick.

In their motion, the defendants argue that Bostwick's claims for intentional infliction of emotional distress (count VII), slander/libel (count IV), and civil conspiracy (count III) are barred by the exclusive remedy provision of Wisconsin's Worker's Compensation Act, Wis. Stat. § 102.03(2). As relevant here, an employer's

obligation to pay worker's compensation arises when, at the time of the injury, the employee is performing service growing out of and incidental to his or her employment, and the accident or disease causing injury arises out of the employment. § 102.03(1).  Bostwick does not dispute that his injuries arose out of his employment. Instead, Bostwick argues that the Act does not apply because he was injured while he was away from work on administrative leave; in other words, he was not "performing service growing out of and incidental to his . . . employment" at the time he was injured by the defendants' conduct.  § 102.03(1)(c)1.  This language — growing out of and incidental to employment — is used interchangeably with the phrase "course of employment."  *Weiss v. City of Milwaukee*, 559 N.W.2d 588, 592 (Wis. 1997).  Both formulations refer to the "time, place, and circumstances" under which the injury occurred.  *Id.*  An injury arises in the course of employment when it takes place within the period of the employment at a place where the employee reasonably may be, and while he or she is fulfilling his or her duties or engaged in doing something thereto. *Id.* (citing Professor Larson's treatise on workers' compensation law).

Wisconsin courts have held that claims for intentional infliction of emotional distress, defamation, and conspiracy are barred by the Act.  *See, e.g., Jenson v. Empl. Mut. Cas. Co.*, 468 N.W.2d 1 (Wis. 1991) (IIED); *Farady-Sultze v. Aurora Med. Ctr. of Oshkosh, Inc.*, 787 N.W.2d 433 (Wis. Ct. App. 2010) (IIED and defamation); *Wolf v. F&M Banks*, 534 N.W.2d 877 (Wis. Ct. App. 1995) (defamation); *Becker v. Automatic Garage Door Co.*, 456 N.W.2d 888 (Wis. Ct. App. 1990) (defamation);

*Mudrovich v. Soto*, 617 N.W.2d 242 (Wis. Ct. App. 2000) (civil conspiracy). However, these cases either assumed or specifically held that the injury occurred while the plaintiff was acting in the course of employment. In *Jenson*, the Wisconsin Supreme Court held that a claim by a village clerk against the village board president for intentional infliction of emotional distress was barred by the WCA, but only because the attacks took place at village board meetings and in the confines of the village hall. Thus, the "undisputed facts" led "overwhelmingly to the conclusion" that the clerk was performing services "growing out of and incidental to . . . her employment" at the time of injury. *Id.* at 8. In *Farady-Sultze*, *Wolf*, and *Becker*, the course of employment requirement was simply not discussed, as the courts seemed to assume that the injuries occurred while the employee was performing service growing out of and incidental to his employment. In *Mudrovich*, the court of appeals held that the course of employment factor was satisfied *because* the alleged injury arose out the plaintiff's employment. 617 N.W.2d at 246 ("Because the remarks resulting in Mudrovich's claimed injury arose out of his employment, we conclude that Mudrovich was performing services growing out of and incidental to his employment at the time of the injury"). This syllogism makes sense in most cases where the employee is injured at work, but it does not always follow that an injury caused by the employment relationship occurs while the employee is acting in the course of employment.

        The defendants argue that all of Bostwick's injuries occurred in the course of employment because he was injured while he was still employed by the district; and

even while he was on administrative leave, Bostwick continued to attend meetings and participate in the investigative process.  However, it is difficult to pinpoint the exact timing of many of the alleged injuries, and since Bostwick was on administrative leave for an extended period of time, it is even more difficult to draw the connection that the injuries occurred at a point in time when Bostwick was performing service growing out of and incidental to his employment.  This result may seem anomalous in light of the obvious work-connection of Bostwick's injuries, but Wisconsin courts have not adopted Professor Larson's "quantum theory" of work connection, under which the weakness of the course of employment factor can be made up by the strength of the arising out of employment factor.  *N. Assur. Co. of Am. V. LIRC*, 455 N.W.2d 915 (Wis. Ct. App. March 1, 1990) (Unpublished opinion).  Other jurisdictions view the two concepts "as a whole to define the injury-employment connection," *Calovecchi v. State of Michigan*, 611 N.W.2d 300, 303 (Mich. 2000), but the Court is obliged to follow Wisconsin law, so the course of employment requirement cannot be ignored.  *Roe v. City of Milwaukee*, 26 F. Supp. 2d 1119, 1123 (E.D. Wis. 1998) (a "federal court's task in exercising supplemental jurisdiction over state claims is to mirror or predict, on the basis of existing state precedent, if any, how a state court would rule on such claims").  Construing Bostwick's allegations in the light most favorable to him, the Court is unable to conclude that any or all of his injuries coincided with a time during which he was acting in the course of employment.

In the alternative, the defendants argue that the conspiracy claim should be

- 7 -

Case 2:13-cv-01036-RTR   Filed 12/04/13   Page 7 of 11   Document 13

even while he was on administrative leave, Bostwick continued to attend meetings and participate in the investigative process.  However, it is difficult to pinpoint the exact timing of many of the alleged injuries, and since Bostwick was on administrative leave for an extended period of time, it is even more difficult to draw the connection that the injuries occurred at a point in time when Bostwick was performing service growing out of and incidental to his employment.  This result may seem anomalous in light of the obvious work-connection of Bostwick's injuries, but Wisconsin courts have not adopted Professor Larson's "quantum theory" of work connection, under which the weakness of the course of employment factor can be made up by the strength of the arising out of employment factor.  *N. Assur. Co. of Am. V. LIRC*, 455 N.W.2d 915 (Wis. Ct. App. March 1, 1990) (Unpublished opinion).  Other jurisdictions view the two concepts "as a whole to define the injury-employment connection," *Calovecchi v. State of Michigan*, 611 N.W.2d 300, 303 (Mich. 2000), but the Court is obliged to follow Wisconsin law, so the course of employment requirement cannot be ignored.  *Roe v. City of Milwaukee*, 26 F. Supp. 2d 1119, 1123 (E.D. Wis. 1998) (a "federal court's task in exercising supplemental jurisdiction over state claims is to mirror or predict, on the basis of existing state precedent, if any, how a state court would rule on such claims").  Construing Bostwick's allegations in the light most favorable to him, the Court is unable to conclude that any or all of his injuries coincided with a time during which he was acting in the course of employment.

In the alternative, the defendants argue that the conspiracy claim should be

stricken to the extent that it is premised on Bostwick's separate claim for tortious interference with contract (count II) because Bostwick cannot recover twice for the same injury. Fed. R. Civ. P. 12(f). Litigants are allowed to plead in the alternative, Fed. R. Civ. P. 8, so the Court will not strike the claim. "To the extent that [plaintiff] will not be able to prevail under both theories of recovery, it need not embrace one over the other at this earlier stage of the proceedings. Double recovery is not threatened in the pleadings stage . . . ." *River West Meeting Assoc., Inc. v. Avaya, Inc.*, No. 03 C 1023, 2004 WL 422683, at *3 (N.D. Ill. March 4, 2004).

Finally, Paul Vance moves to dismiss the claims directed solely at him: breach of fiduciary duty (count V) and misrepresentation (count VI). Vance argues that there can be no fiduciary relationship in the absence of a duty to act solely on behalf of one person above all others. This is wrong. A fiduciary duty can arise when a party assumes an obligation to act as a third-party neutral. *See, e.g., Black v. Metro Title, Inc.*, 712 N.W.2d 395, 398 (Wis. Ct. App. 2006) ("An escrow agent acts as a neutral third party. The escrow agent owes a fiduciary duty to both parties of the escrow contract"); *In re Appeal of Sheaffer*, 686 N.E.2d 1382, 1390 (Ohio Ct. App. 1996) ("Brokers who have been entrusted with earnest money have a fiduciary duty to remain the neutral agent of both parties even though the broker may also be the agent of one of the parties in the underlying transaction"); *Matter of Estate of Shano*, 869 P. 2d 1203, 1208-09 (Ariz. Ct. App. 1993) (attorney for personal representative of estate has derivative fiduciary duty of neutrality and impartiality to successors of decedent's

estate). Bostwick's allegations plausibly establish the existence of a fiduciary duty. *Doe v. Archdiocese of Milwaukee*, 700 N.W.2d 180, 194 (Wis. 2005) ("A fiduciary relationship arises from a formal commitment to act for the benefit of another . . ."). The Court also rejects Vance's argument that Bostwick failed to plead enough facts in support of his misrepresentation claim, to wit, that in the summer of 2012, Vance falsely represented to Bostwick that he was conducting a thorough and good faith investigation of Bostwick's harassment complaint and that Bostwick relied on this representation in cooperating with Vance's investigation. This is more than enough to meet the requirements of Rule 9. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 509 (7th Cir. 2007) ("Rule 9(b) requires that facts such as the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff be alleged in detail").

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1.  The defendants' motion to dismiss [ECF No. 4] is **DENIED**;

2.  Pursuant to Federal Rule of Civil Procedure 16(b), a telephonic scheduling conference is scheduled for **February 4, 2014** at **10:00 a.m.** (Central Time). Please be available at that time. The Court will initiate the call.

3.  The purpose of the conference call is to establish a scheduling order which will limit the time: (a) to join other parties and to amend the pleadings; (b) to

file motions; (c) to complete discovery;

    4.    The scheduling order may also: (a) modify the timing for disclosure under Rules 26(a) and 26(e)(1) and of the extent of discovery to be permitted; (b) provide for the disclosure or discovery of electronically stored information; (c) include any agreements the parties reach for asserting claims of privilege or protection as trial preparation material after information is produced; (d) the date or dates for conferences before trial, a final pretrial conference, and trial; and (e) any other matters appropriate in the circumstances of the case;

    5.    The time limitations set forth in the scheduling order may only be modified for good cause and with the Court's consent. Fed. R. Civ. P. 16(b)(4);

    6.    The parties should be prepared to discuss the matters listed in Civil Local Rule 16(a)(1). Please refer to Attachment A. Special attention should also be given to Rule 26(f)(1), which requires the parties to conduct a settlement/discovery conference at least twenty-one (21) days prior to the initial scheduling conference described above. The Rule 26(f) conference may be conducted by telephone. Rules 26(f)(2) and (3) mandate that the parties, within fourteen (14) days of their conference: (a) file a written report outlining the proposed discovery plan they have developed at their Rule 26(f) conference; and (b) make the required initial disclosures under Rule 26(a) regarding witnesses and documents. In addition to the matters specified in Rules 26(f)(2) and (3), the Court requests that the proposed discovery plan submitted by the parties include one or two sentences stating the nature of the case;

- 10 -

Case 2:13-cv-01036-RTR   Filed 12/04/13   Page 10 of 11   Document 13

7. The written report must include the telephone numbers where the parties can be reached for this call.

8. In addition, Judge Randa is participating in the Seventh Circuit Electronic Discovery Pilot Program and has adopted the <u>Principles Relating to the Discovery of Electronically Stored Information</u>. Counsel should be fully prepared to discuss methods and techniques to accomplish cooperative fact-finding in their case at the initial status conference. Before the initial status conference, counsel must also meet and discuss the Principles Relating to the Discovery of Electronically Stored Information. At the initial status conference, counsel must be prepared to discuss what agreements they have reached regarding discovery of Electronically Stored Information ("ESI") and what area of disagreement they have with regard to discovery of ESI. After discussing the matter with counsel, the Court will determine whether to enter the <u>Standing Order Relating to the Discovery of Electronically Stored Information</u> in their particular case. (Please refer to Attachments B & C).

Dated at Milwaukee, Wisconsin, this 4th day of December, 2013.

                                            **BY THE COURT:**

                                            *[signature]*
                                            **HON. RUDOLPH T. RANDA**
                                            **U.S. District Judge**