# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**SCOTT BOSTWICK,**

          Plaintiff,

      **-vs-**                     **Case No. 13-C-1036**

**WATERTOWN UNIFIED SCHOOL
DISTRICT, BOARD OF EDUCATION
OF THE WATERTOWN UNIFIED
SCHOOL DISTRICT, KATE LAPIN,
CASSANDRA SCHUG, IVAN THOMPSON,
DOUGLAS KEISER, ROBERT BAXTER
and PAUL VANCE,**

          Defendants.

---

## DECISION AND ORDER

---

Scott Bostwick alleges that he lost his job as Principal of Watertown High School because of an orchestrated campaign to replace him with a younger woman. In his amended complaint, Bostwick brings claims for discrimination and retaliation under Title VII and the Age Discrimination in Employment Act ("ADEA"); a procedural due process claim under 42 U.S.C. § 1983; an equal protection "class of one" claim; and state law claims for breach of contract, misrepresentation, breach of fiduciary duty, tortious interference with contract, defamation, intentional infliction of emotional distress, and conspiracy.

Now before the Court is the defendants' motion for summary judgment. For the reasons that follow, the vast majority of Bostwick's claims survive summary judgment.

## BACKGROUND[1]

Bostwick became the Principal of Watertown High School in May 2002. Until the events at issue in this litigation, Bostwick's employment record was perfect. His personnel file did not contain a single complaint or disciplinary reprimand. During his tenure as principal, Bostwick received glowing and unqualified letters of recommendation from Superintendent Douglas Keiser, Human Resources Manager Jim Martin, and Human Resources Manager Robert Baxter.

Cassandra Schug became Superintendent for the Watertown Unified School District in the summer of 2011, replacing Keiser. Schug was recruited for and placed in the Superintendent position by Baxter, the District's then-retiring Human Resources Manager. Baxter told Martin that with the new Superintendent (Schug) there would be "changes in the leadership at the [Watertown] High School and at the middle school."

By Fall 2011, Bostwick heard suggestions that Schug intended to

_____

[1] The following background is largely compiled from Bostwick's proposed findings of fact. The defendants object to and dispute many of Bostwick's findings on various grounds. The Court will not address each and every objection or dispute. Suffice it to say, the Court is persuaded that Bostwick has more than enough admissible evidence to bring his case to a jury.

replace him. Bostwick was concerned for his job so he approached Schug about her alleged plans. Schug denied that she wanted to replace Bostwick. Still concerned, Bostwick reached out to Schug in early 2012 to learn – purely for information purposes – what options might be available to him if he retired early. By early 2012, Bostwick was close to completing a superintendent's certificate and intended to pursue a superintendent opportunity with another district after his "retirement" from the District, a common practice for school administrators.

Schug, along with Ivan Thompson, met with Bostwick on February 17, 2012. At this time, Thompson was the District's new Human Resources Manager. Previously, Thompson was the principal at Watertown High School, but he was replaced by Bostwick when Bostwick took the position in 2002. During Thompson's tenure as principal, there were problems with student discipline, teacher accountability and academics. Bostwick replaced Thompson to address these deficiencies.

At the February 17 meeting, Schug and Thompson presented Bostwick with a proposed agreement to retire at the end of the school year in exchange for accelerated vesting of benefits. Bostwick indicated that he was not prepared to retire until he identified another job opportunity. Schug told Bostwick that the District would not accommodate that request. Bostwick explained that he did not want to retire. In response, Schug told Bostwick that

she wanted him to know that he was under investigation for unspecified misconduct "so that he would be able to consider what he wanted to do." Schug told Bostwick that it was in his best interests to sign the early retirement document and that the investigation would end if he signed it. Schug said the investigation included many staff members and that it "did not look good" for Bostwick. Schug said, "If you make a decision to retire early, we won't continue this investigation."

Confused and taken aback, Bostwick asked about the allegations. Schug and Thompson left the room to call the District's lawyer, Mary Hubacher. When they returned, Schug and Thompson told Bostwick that he was being accused of mistreating older female staff on the basis of age and gender. Bostwick denied any discriminatory conduct. In response, Thompson said, "it looks like you are guilty." Schug said, once again, that "things did not look good" for Bostwick. At this point, neither Schug nor Thompson had heard Bostwick's side of the story. They refused to give Bostwick any details regarding the charges against him.

After the February 17 meeting, Bostwick was convinced that Schug and Thompson were trying to force him into involuntary retirement. At the time, Bostwick was 52 years old. Bostwick knew that he had never discriminated against anyone or committed serious misconduct during his tenure. Therefore, he was confused and thought this might be a

misunderstanding, and if he could just tell his side of the story, the whole matter would be dismissed. However, he was also scared because he spent his entire career in education and if he was driven out of his job because of alleged misconduct, that career would be over.

On February 22, Bostwick sent an e-mail to Schug complaining about his treatment at the February 17 meeting, and requesting permission to bring a complaint to the Board. According to published policy, an employee can initiate such a complaint, but when the complaint is against the Superintendent, it must be taken to the Board President. When Bostwick asked Schug whether he could talk to Board President Dennis Rambo about the February 17 meeting and his concerns, Schug forbade him from doing so, saying that "it is imperative that you not speak with any Board members at this time."

Bostwick still wanted to register his complaint in writing, so on March 5, he wrote an additional e-mail to Schug outlining his concerns. Schug responded by agreeing to meet with him on March 23. Jim Martin, the District's HR Manager for 17 years before Baxter retired in 2006 (spanning several years of Bostwick's tenure), agreed to attend as a third-party witness.

At the beginning of the March 23 meeting, Schug and Thompson gave Bostwick a written set of options – if he wanted to resign or retire with some benefits, he had to agree to sign an irrevocable letter of intent within one

week (in which case he could work through the end of the school year) or the investigation would continue. However, the District still refused to give Bostwick any notice of the allegations or evidence against him. Martin expressed concern that the District's proposal made no sense – if the District really felt like Bostwick behaved improperly, the District had a duty to complete the investigation and not just "pretend like it never happened" and let Bostwick finish out the school year. Concerned about confidentiality, Martin asked Thompson whether former District HR Manager Baxter knew about the ongoing investigation against Bostwick. Earlier that month, Thompson was in Florida and stayed overnight at Baxter's home. In response to Martin's question, Thompson ultimately conceded that Baxter knew about the investigation. In response, Schug acted surprised, pushed back her chair and said "oh, my gosh" or "oh, my God!"

Martin took detailed notes of the March 23 meeting. At the conclusion of the meeting, Martin was convinced that Schug and Thompson "were trying to get rid of [Bostwick] and were going to use pretty much any method they could."

On May 11, Bostwick was called to a meeting by Thompson to discuss details of the investigation. David Vitale, Director of Curriculum Instruction, attended this meeting to take notes for the District. Martin also attended as a third-party witness for Bostwick. Thompson read through a list of questions

involving more than 40 alleged incidents or issues dating all the way back to Bostwick's first weeks on the job a decade earlier. Thompson would not give Bostwick a copy of the charges he was reading from or even time for Martin to take complete notes. Thompson also refused to answer any clarifying questions and would not let Martin speak even though he had firsthand knowledge of several of the issues from when he was HR Manager.

To Martin, it appeared that the investigation was a witch hunt because Thompson was not asking "whether" Bostwick had done certain things, but "why" he did them. Because of the nature of the questions he was asking, Martin concluded that Thompson had already "come to the conclusion that Scott is guilty." Based on Thompson's conduct and the alleged "charges," Martin was appalled and could not believe the vast majority of the items would be included in any reasonable investigation. Many of the claims were speculative, based solely on hearsay, had no times or dates, and led Martin to wonder "what were they doing here?" Before the meeting, Martin was concerned that perhaps Bostwick had committed some serious misconduct, but after the meeting Martin was "relieved that there wasn't anything" and that none of the allegations warranted the kind of investigation that had allegedly been going on.

After the May 11 meeting, Bostwick was stuck in limbo due to Schug's instruction not to communicate with the Board. Eventually, Bostwick felt he

had no choice but to violate that instruction. On June 5, Bostwick sent a letter through counsel to Board President Kate Lapin at her home registering his complaint of harassment, and pleading for assistance. Lapin forwarded the letter to Schug and Thompson – the same people that Bostwick claims were harassing him. Lapin claims that she never actually read the letter until her deposition two years later.

On June 7, Bostwick's counsel received a response from Attorney Hubacher. Hubacher scolded Bostwick's attorney for contacting the Board and demanded that any future attempt to communicate with the Board be directed to her. On June 12, the District, in a letter written by Schug, responded to Bostwick's complaint by suspending him with pay and warning him, once again, that Bostwick and his counsel were forbidden from having contact with Board members.

On June 14, Bostwick lodged another complaint with the Board. Because Bostwick was not allowed to contact Lapin directly, the June 14 letter was presented through Attorney Hubacher. Bostwick asked for an independent investigation and that the full Board be provided with a copy of his complaint. In the months that followed, Bostwick repeatedly inquired about the status of his complaint through correspondence between his counsel and Attorney Hubacher. At the same time, Bostwick was attempting to defend himself in connection with the charges set forth in the first version

of Thompson's Findings and Conclusions. In correspondence between Bostwick's counsel and District counsel, Bostwick provided information to the best of his ability regarding what he could understand of the charges against him.

Eventually, the District agreed to allow Bostwick to come to a meeting with Thompson and Schug (along with counsel for both sides) to go through each of the 42 complaints. These meetings took place on July 27 and August 1. After these meetings, the District responded by expanding the scope of the investigation. This resulted in the District producing four different versions of the Findings and Conclusion, which progressively increased from 25 pages to 51 and from 19 witnesses to 46. Eventually, with the final version of the Findings and Conclusions on August 23, Schug formally recommended Bostwick's termination to the Board. Bostwick appealed the determination, and his hearing before the Board was scheduled for September 25-26.

***

On July 22, 2012, the District engaged Paul Vance to conduct an investigation into Bostwick's complaint against Schug and Thompson. After meeting with Schug to discuss Bostwick's complaint, Vance wrote the following e-mail:

> Hello Cassandra. Thank you for your time this morning. I know how hard this case is for you as a superintendent. It can be such a distraction from your passion of educating children

but you are an obviously strong person and you will prevail. I have some creative ideas I will convey to Mary [Hubacher]. Stay strong and feel free to call me or email me at any time. Been down the path. Paul.

After multiple attempts by Bostwick's counsel, Vance eventually agreed to meet with Bostwick. Vance limited the meeting to less than an hour and, among other things, indicated that he was not prepared to discuss specifics in the Findings and Conclusions. Bostwick explained to Vance that in order for him to understand the harassing nature of the investigation it was necessary to go through the report and discuss the reasons why the complaints were unsupported and/or involved matters that would never be the subject of a legitimate investigation. Vance emphasized that he was a truly independent third party, that he would be fair and impartial and that he had not prejudged the situation or reached any conclusions.

According to Bostwick, Vance agreed to meet again in the future. However, Vance proceeded to ignore several urgent requests from Bostwick's counsel to communicate. For whatever reason, Vance determined that he did not need to meet with Bostwick a second time as part of his investigation.

On September 12, less than two weeks before Bostwick's termination hearing, Vance met with the Board in closed session. In his report, Vance concluded that the decision to initiate the investigation of allegations concerning Bostwick's behavior was required by Board policy and state and

federal law. Vance also concluded that the District's investigation into Bostwick's actions was conducted without discrimination or harassment against Bostwick. The Board adopted Vance's findings and conclusions, voting to dismiss Bostwick's complaint.

***

Bostwick's termination hearing began at 5:30 p.m. on September 25, 2012. At midnight, the School Board continued the hearing to the next day. On September 26, the hearing ran from 5:30 p.m. to 10:00 p.m.. Each side was allowed five hours to present their case. The School District called five witnesses. Bostwick, through counsel, cross-examined each of those witnesses. Bostwick did not call any witnesses on his own behalf. Instead, Bostwick's legal counsel made a presentation and Bostwick made a brief statement to the School Board.

After deliberating for nearly three hours, the School Board unanimously decided to terminate Bostwick's employment contract effective immediately. The Board determined that Bostwick engaged in ten different actions that violated School Board policies, as enumerated in the Board's eventual written decision. The Board members determined that Bostwick's behaviors were unprofessional, demonstrated poor judgment, were inappropriate for a person in a leadership position, were divisive, undermined the relations among and between administrators as well as staff, and affected

staff morale for no legitimate purpose. Additionally, the Board considered the fact that Bostwick did not recognize or admit to his actions or the impact of his behavior.

***

In the fall of 2011, soon after Schug became Superintendent and around the time Bostwick started to become concerned about his own job security, Watertown High School Assistant Principal Daniela Stuckey had a meeting with Schug to tell her she was considering applying to be a principal in another district. Stuckey wanted to know if she fit into Schug's "vision" for the future. Schug encouraged Stuckey to stay, indicating that she would support Stuckey's professional growth and that Stuckey "fit in with her philosophy." Stuckey did not apply for the outside position.

Prior to firing Bostwick, the Board viewed Stuckey as a possible replacement for Bostwick but was mindful that such a move would appear improper. When the District was looking to fill the Principal position on a permanent basis, Schug offered the job to Stuckey. At the time, Stuckey was one of multiple candidates, but Schug told Stuckey the job was hers if she wanted it because "the Board designates to me those sorts of hiring decisions." However, Schug also proposed that instead of taking the High School Principal job, Stuckey should become Middle School Principal, a position then held by Kent Jacobson (also an older male), who could be moved to one of the

elementary schools. Stuckey agreed, and the switch was made with Jacobson.

## ANALYSIS

Summary judgment should be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The plain language of the rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court accepts as true the evidence of the nonmovant and draws all justifiable inferences in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

A party resisting summary judgment must present evidence "demonstrating that there is a genuine issue for trial." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). Bostwick has done so on nearly all of his claims.

## I.  Age and Sex Discrimination/Retaliation

To establish an ADEA violation, Bostwick "must show that age actually motivated the adverse employment action at issue. Put differently, age must have played a role in the employer's decision-making process and had a determinative influence on the outcome." *Mullin v. Temco Mach., Inc.*, 732

F.3d 772, 776 (7th Cir. 2013). ADEA and Title VII[2] retaliation claims require a showing of but-for causation. *Barton v. Zimmer, Inc.*, 662 F.3d 448, 455 (7th Cir. 2011) ("Under the ADEA retaliation must be a but-for cause of a materially adverse action, not merely a contributing factor") (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009)); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, --- U.S. ----, 133 S. Ct. 2517, 2534 (2013) (the "text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim … must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer"). To succeed on his Title VII gender discrimination claim, Bostwick must prove that his gender was a motivating factor in his termination. *Lewis v. City of Chi.*, 590 F.3d 427, 437-38 (7th Cir. 2009).

Under the direct method of proof, Bostwick can survive summary judgment by presenting direct or circumstantial evidence that is sufficient to create an inference of intentional discrimination. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 393 (7th Cir. 2010). Similarly, Bostwick can survive summary judgment on his retaliation claim if he provides evidence of a causal connection between his protected activity and his termination (or other adverse employment action). *Silverman v. Bd. of Educ. Of Chi.*, 637 F.3d 729,

---

[2] It is unclear whether Bostwick brings a claim for Title VII retaliation, but the distinction is irrelevant for present purposes.

740 (7th Cir. 2011). Direct evidence would require something like an admission that Bostwick was terminated because of his age or gender (or because he complained about such discrimination). Bostwick, like most litigants, doesn't have this kind of evidence. Instead, Bostwick uses circumstantial evidence to construct "a convincing mosaic" that "allows a jury to infer intentional discrimination by the decision maker." *Collins v. Am. Red Cross*, 715 F.3d 994, 1000 (7th Cir. 2013).

In retaliation and discrimination cases, courts recognize three categories of circumstantial evidence available to a plaintiff using the "convincing mosaic" approach. First, "suspicious timing, ambiguous statements oral or written, … and other bits and pieces from which an inference of [discriminatory or retaliatory] intent might be drawn." *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012). Second, "evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently." *Id.* Third, "evidence that the employer offered a pretextual reason for an adverse employment action." *Id.* "Each type of evidence is sufficient by itself (depending of course on its strength in relation to whatever other evidence is in the case) to support a judgment for the plaintiff; or they can be used together." *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 736 (7th Cir. 1994).

The evidence put forth by Bostwick easily supports the inference that

he was fired because of his age and also his gender. Schug, the new Superintendent, wanted to make personnel changes in administration. Schug's discussions with Stuckey suggest that Schug wanted to promote younger women, and in turn, that Bostwick was targeted because he is male and older (aside from age and gender, Stuckey was similarly situated to Bostwick in all material respects). The easiest way to make the Watertown High School principal position available would be to convince Bostwick to voluntarily retire, but if Bostwick refused, Schug needed leverage to force him out the door. Thus, when Bostwick declined the offer for early retirement, Schug and Thompson threatened Bostwick with a continued investigation into previously undisclosed allegations of wrongdoing. When Bostwick dug in his heels, Schug and Thompson embarked upon a summer-long investigation to justify Bostwick's eventual termination to the Board.

The same inferences can be drawn with respect to Bostwick's retaliation claim. Bostwick engaged in protected activity in February and March of 2012 when he sent e-mails to Schug complaining about his treatment, and also in June when he filed a formal harassment claim with the Board. Bostwick's refusal to retire and his complaints about his treatment at the hands of Schug and Thompson would seem to go hand-in-hand. If Bostwick took the retirement offer and went away quietly (in lieu of complaining about mistreatment), he would not have been terminated.

Therefore, a jury could find a causal connection between Bostwick's complaints and his termination.[3]

Defendants argue that all of the foregoing is irrelevant because the Board – not Schug or Thompson – made the ultimate decision to terminate Bostwick. This argument fails for two reasons. First, there is evidence that the Board deferred to Schug on personnel decisions. *See, e.g., Mateu-Anderegg v. Sch. Dist. of Whitefish Bay*, 304 F.3d 618, 624 (7th Cir. 2002) ("Depending on how a particular school district operates, it seems likely that a principal or superintendent can be a decisionmaker").

Second, and for similar reasons, the Board may be liable under the "cat's paw" theory. In the "fable of the cat's paw, … a monkey who wants chestnuts that are roasting in a fire persuades an intellectually challenged cat to fetch the chestnuts from the fire for the monkey, and the cat does so but in the process burns its paw." *Cook v. IPC Int'l Corp.*, 673 F.3d 625, 628 (7th Cir. 2012). Using this metaphor, employment discrimination law recognizes that "a final decision-maker's reliance on an improperly motivated recommendation from a subordinate may render the … employer liable because the subordinate acts as the firm's agent." *Smith v. Bray*, 681 F.3d 888, 897 (7th Cir. 2012); *see also Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)

---

[3] Bostwick can also show a causal connection between his initial complaints to Schug and the District's failure to properly investigate his formal complaint against Schug and Thompson.

(endorsing the cat's paw theory in employment discrimination context). Bostwick's evidence suggests that once he refused to retire, Schug and Thompson[4] embarked upon an odyssey to find as much Bostwick-related dirt as possible in an effort to ensure that the Board would approve Bostwick's eventual termination. Thus, Bostwick can proceed to trial under the cat's paw theory. *See, e.g., Dey v. Colt Const. & Dev't Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994) ("Summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action"); *Willis v. Marion Cnty. Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997) (employer liable where subordinate "is able to manipulate the decisionmaking process and to influence the decision").

## II.    Procedural Due Process

This claim is brought against Schug, Thompson, and Board President Kate Lapin in their individual and official capacities. Defendants mistakenly argue that Bostwick did not plead individual capacity claims. *See* Amended Complaint, ¶ 105 ("While acting individually and in a supervisory capacity, Defendants Schug, Thompson, and Lapin failed to provide Bostwick with

---

[4] Thompson's motivations may have been more personal – as noted above, Thompson was demoted in favor of Bostwick years prior. For present purposes, all that matters is that Thompson assisted Schug, and there is evidence to suggest that Schug had an impermissible motive.

adequate procedural protection …"). In the alternative, defendants request an opportunity to fully brief the issue of qualified immunity. Defendants waived the defense because they failed to raise it in their motion for summary judgment, nor did they raise it in any of their pleadings. *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) (if defendants "felt entitled to terminate the proceedings because of qualified immunity," they were "required to bring that issue to the district court's attention" in their motion for summary judgment).

To succeed on a procedural due process claim under Section 1983, Bostwick must show (1) that he had a constitutionally protected property interest; (2) that defendants deprived him of that interest; and (3) that the deprivation occurred in a way that violated due process. *Price v. Bd. of Educ. Of City of Chi.*, 755 F.3d 605, 607 (7th Cir. 2014). Defendants do not dispute the first element – that Bostwick had a property interest in his continued employment as Watertown High School principal.

Under the second element, Bostwick's official capacity claims are, in essence, claims against the School District, acting through the School Board. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985). It is undisputed that the Board was vested with final decisionmaking authority with respect to Bostwick's termination. Thus, the District may be subject to municipal liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-92 (1978); *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir.

2001) (for purposes of municipal liability, the question is "whether the promulgator, or the actor, as the case may be – in other words, the decisionmaker – was at the apex of authority for the action in question").

To impose individual liability, Bostwick must show that Schug, Thompson and Lapin caused or participated in the deprivation. *Bray*, 681 F.3d at 899. For the reasons already stated, Schug and Thompson can be held individually liable under the "cat's paw" theory of liability. *Id.* (noting that there is "precedent from five other circuits for imposing *individual* liability on the unlawfully motivated subordinate (the monkey, in the cat's paw fable) under § 1983"). Lapin can be individually liable because she directly participated in the Board's vote to terminate Bostwick's employment in her capacity as Board President. Lapin knew or had reason to know that the process was infected since she was privy to Bostwick's harassment complaint against Schug and Thompson. *T.E. v. Grindle*, 599 F.3d 583, 588 (7th Cir. 2010) (supervisors may be subject to individual liability if they "know about constitutional conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see").

Finally, the Court must analyze whether Bostwick was given constitutionally adequate due process. Generally, this means notice and an opportunity to respond. *See, e.g., Salas v. Wis. Dep't of Corr.*, 493 F.3d 913, 927 (7th Cir. 2007); *Staples v. City of Milwaukee*, 142 F.3d 383, 385 (7th Cir.

- 20 -

1998) (due process requires (1) oral or written notice of the charges, (2) an explanation of the employer's evidence, and (3) an opportunity to tell his side of the story). Bostwick does not dispute that he was afforded these basic procedures – notice of the charges against him, and the opportunity to present evidence and cross-examine witnesses at a 10-hour, two-day hearing. However, for many of the reasons already stated, Bostwick contends that the game was rigged, and his hearing was nothing more than a show trial. *Purvis v. Oest*, 614 F.3d 713, 718 (7th Cir. 2010) ("fundamentally biased process is not *due* process"); *Schacht v. Wis. Dep't of Corr.*, 175 F.3d 497, 503 (7th Cir. 1999) ("sham procedures do not satisfy due process").

*Oest* is instructive. In *Oest*, a teacher named Purvis was accused of engaging in improper sexual relations with a student. The Dean of Students, Vicini, was appointed to play a leading role in investigating the allegations. At the time, Vicini was aware that Purvis had previously lodged a harassment complaint against him. The Seventh Circuit noted that it was "axiomatic that an individual accused of sexual harassment by a fellow teacher, and who was informed of the identity of the accuser, might harbor some resentment against that accuser." 614 F.3d at 718. Since Vicini exercised "at least some influence" over the course of the investigation, the court held it "fair at the summary-judgment juncture to characterize the school's investigation of Purvis as fundamentally biased." *Id.*

The Court has already emphasized that Thompson was potentially biased against Bostwick because Bostwick replaced Thompson as Watertown High Principal. Moreover, at the initial February 12 meeting with Bostwick, Schug and Thompson made ominous statements about the outcome of a potential investigation ("it does not look good," "it appears that you are guilty"). This was before hearing Bostwick's side of the story – indeed at that point, Schug and Thompson refused to give Bostwick any details about the allegations against him. Moreover, Schug and Thompson continued to direct and conduct the investigation against Bostwick even after Bostwick filed a harassment complaint against them with the Board – a complaint they became aware of when it was forwarded to them by Lapin. As in *Oest*, the inference of bias is clear (perhaps more so).

The Board's hearing did not, as the defendants suggest, somehow purify the biased investigation that informed the hearing in the first instance. In this regard, the defendants' reliance on *Trejo v. Shoben*, 319 F.3d 878 (7th Cir. 2003) is misplaced. In *Trejo*, the bias of the initial investigator was trumped by "two separate, independent faculty committees which conducted their own investigations of the charges and likewise came to the conclusion that Trejo's misconduct warranted his removal from the faculty." *Id*. at 888. Here, as in *Oest*, there is an issue of fact as to whether the Board was sufficiently independent from the investigation that formed the basis for the

hearing. *Oest* at 720. Thus, the Board can still be considered a cat's paw even though it held a hearing and heard evidence prior to terminating Bostwick. *See, e.g., Kramer v. Logan Cnty. Sch. Dist. No. R-1*, 157 F.3d 620, 624-25 (8th Cir. 1998) ("The question of whether the school board accurately [assessed] Kramer's situation or performed a perfunctory review and 'rubber stamped' the recommendation to non-renew was appropriately presented to the jury").

Finally, prejudgment is also an issue in this case. *Schacht*, 175 F.3d at 502 ("One of the most basic guarantees of fair procedure is an unbiased decisionmaker"). In April of 2012, Schug made a presentation to a closed session of the Board. The "gist" of her presentation was that "this was not looking good for Mr. Bostwick." Plaintiff's Proposed Findings of Fact, ¶ 121. Board Member Dennis Rambo testified as follows:

> Q:   How did you as of that point in time, a closed door meeting, and up until the time that you got the first draft report, how did you know that the allegations were actually serious?
>
> A:   I believe we would have gotten a report from Cassandra Schug – or not necessarily a report – there would have been a conversation that things were looking bad and that Mr. Bostwick's future could be in question.
>
> Q:   I understand that you were told by Ms. Schug that it was a serious situation and that Mr. Bostwick's future might be in jeopardy. But how did you know whether what she was telling you was true?
>
> A:   *The reason I would have known it was true is because I have trust in Cassandra Schug. I do not believe she would have*

*told me something that was not true.*

ECF No. 47-6, Rambo Dep. at 109 (emphasis added). Thus, there is evidence in the record that at least one Board member pre-judged the case against Bostwick because of his faith and trust in Schug. This is sufficient to undermine the integrity of the Board in its entirety. *Stivers v. Pierce*, 71 F.3d 732, 748 (9th Cir. 1995) ("where one member of a tribunal is actually biased, or where circumstances create the appearance that one member is biased, the proceedings violate due process").

## III.   State Law Claims

As an initial matter, the defendants incorporate by reference the arguments made in support of their motion to dismiss Bostwick's state law claims for conspiracy, defamation and intentional infliction of emotional distress pursuant to the exclusivity provision of the Wisconsin Worker's Compensation Act. The Court rejected this argument because it was "unable to conclude that any or all of [Bostwick's] injuries coincided with a time during which he was acting in the course of employment." ECF No. 13, December 4, 2013 Decision and Order at 7. Now, in their motion for summary judgment, the defendants offer nothing to suggest or establish that Bostwick's injuries occurred when he was acting in the course of employment. For the reasons previously stated, Bostwick's claims are not barred by the exclusivity provision.

## A. Breach of Contract

Breach of contract consists of three elements: the existence of a valid contract, a violation or breach of the terms of that contract, and damages. *Steele v. Pacesetter Motor Cars, Inc.*, 672 N.W.2d 141, 144 (Wis. Ct. App. 2003). Defendants do not dispute that Bostwick had a valid employment contract with the School District. Nor do the defendants question Bostwick's ability to prove damages. The only relevant issue is breach.

Pursuant to the terms of his contract, Bostwick was entitled to procedural due process prior to any termination during the term of his contract, and he could only be terminated for reasons that were not arbitrary or capricious. ECF No. 47-10, Employment Contract. As the Court already explained, there is an issue of fact as to whether Bostwick's termination was the result of a biased investigation and a pre-judged hearing process. A jury could also conclude that Bostwick's termination was arbitrary and capricious in light of evidence suggesting that Bostwick was fired for unlawful, discriminatory reasons. *Clark v. Waupaca Cnty. Bd. of Adjustment*, 519 N.W.2d 782, 785 (Wis. Ct. App. 1994) ("A decision of a board is arbitrary or capricious if it is unreasonable or without a rational basis"). Therefore, Bostwick can proceed to trial on his breach of contract claim.

## B. Misrepresentation/Breach of Fiduciary Duty

Bostwick brings claims for negligent and intentional misrepresentation

against Paul Vance. All misrepresentation claims share the following required elements: (1) the defendant must have made a representation of fact to the plaintiff; (2) the representation of fact must be false; and (3) the plaintiff must have believed and relied on the misrepresentation to his detriment or damage. *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 299 (Wis. 2004). An intentional misrepresentation claim includes the following additional elements: (4) the defendant must have made the misrepresentation with knowledge that it was false or recklessly without caring whether it was true or false; and (5) the defendant must have made the misrepresentation with intent to deceive and to induce the plaintiff to act on it to his detriment or damage. *Id.* Negligent misrepresentation, of course, requires negligence in making the misrepresentation. *Grube v. Daun*, 496 N.W.2d 106, 115 (Wis. Ct. App. 1992); *see also Ollerman v. O'Rourke Co., Inc.*, 288 N.W.2d 95, 99 (Wis. 1980) ("In negligence, the defendant need only fail to exercise ordinary care in making a misrepresentation or in ascertaining the facts but like other cases of negligence, it requires a duty of care or a voluntary assumption of a duty") (quoting *Whipp v. Iverson*, 168 N.W.2d 201 (Wis. 1969)).

Liability for misrepresentation must be based on a false statement of present or pre-existing fact, not an unfulfilled promise or statement as to future events that turns out to be mistaken. *Badger Pharmacol, Inc. v. Colgate-Palmolive Co.*, 1 F.3d 621, 627 (7th Cir. 1993). However, an exception

exists "where the promisor, at the time the promise or representation was made, had a present intention not to perform." *Id.* at 628 n.7 (citing *Hartwig v. Bitter*, 139 N.W.2d 644, 647 (Wis. 1966)). The exception applies here because while Vance insisted that he would be fair and impartial, the evidence suggests just the opposite. Vance met with Bostwick and his counsel to discuss the allegations only once and only for an hour, and then refused to meet with them again because he deemed it unnecessary. More remarkable is Vance's supportive email message assuring Schug that she would "prevail." This suggests, rather directly, that Vance never intended to conduct an unbiased, independent investigation.[5]

Also against Vance, Bostwick states a claim for breach of fiduciary duty. Vance argues that he did not owe Bostwick such a duty, but as the Court previously explained, a "fiduciary duty can arise when a party assumes an obligation to act as a third-party neutral." December 4, 2013 Decision and Order at 8. Vance's conduct during his supposedly impartial investigation – meeting with Bostwick once for only an hour; leading Bostwick to believe that they would meet again; ignoring Bostwick's repeated requests to meet again; then meeting with the Board in secret to recommend dismissing Bostwick's

---

[5] In this context, Bostwick's claim makes more sense as one for intentional misrepresentation, not negligent misrepresentation. *Badger Pharmacal, Inc.*, 1 F.3d at 628 n.7 ("While some cases have touched upon this exception in the context of claims for negligent and strict responsibility misrepresentation, it would appear that if one making misrepresentations had a present intention not to perform them, the aggrieved party's claim would properly and logically be one for intentional misrepresentation").

complaint – is enough to raise an issue of fact as to whether he breached this duty. Bostwick can also prove damages because Vance's conduct, if true, deprived Bostwick of the opportunity to contest the legitimacy of the investigation that resulted in his termination. *Berner Cheese Corp. v. Krug*, 752 N.W.2d 800, 809 (Wis. 2008) (listing elements for claim).

### C.    Tortious Interference with Contract

To succeed on this claim, Bostwick must show (1) that he had a contractual relationship with the District; (2) that the defendants interfered with that contractual relationship; (3) that the interference was intentional; (4) that a causal connection exists between the interference and Bostwick's damages; (5) and that the defendants were not justified or privileged to interfere. *Wolnak v. Cardiovascular & Thoracic Surgeons of Cent. Wis.*, 706 N.W.2d 667, 675 (Wis. Ct. App. 2005). For many of the reasons already stated, the Court agrees that Bostwick has enough evidence to proceed to trial on such a claim against Schug, Thompson, Vance, Lapin and the Board. Bostwick puts forth evidence that these defendants "acted from ill will or an improper motive," which would negate the good faith privilege. *Wolf v. F&M Banks*, 534 N.W.2d 877, 885 (Wis. Ct. App. 1995).

Regarding Baxter and Keiser, Bostwick argues that they "intentionally made false, damaging statements that they either knew or reasonably should have known could lead to Bostwick's employment contract being terminated."

ECF No. 49, Brief at 55. In a later section discussing defamation, Bostwick explains that during his entire tenure, Keiser and Baxter "only even raised the *possibility* of corrective action on one occasion. In that case, not only did Bostwick receive no discipline, Keiser and Baxter also agreed that any documentation regarding the matter would be permanently removed from his personnel file." *Id.* at 56. However, Bostwick asserts that Keiser and Baxter "falsely stated to Thompson that they had not agreed to permanently remove from Bostwick's personnel file any documentation regarding the matter. This false and misleading statement regarding Bostwick's employment record was communicated to the District and used to justify accepting the premise of, as well as the credibility of many of the charges within, the 42 charges set forth in Thompson's investigative report."

The problem with this argument is that, so far as the Court can ascertain, there is no evidence in the record to suggest that Keiser or Baxter actually made these statements to Thompson. The Court looked beyond the proposed findings of fact and into the underlying record,[6] but to no avail. Therefore, the Court has no choice but to conclude that Bostwick's claims against Keiser and Baxter cannot survive summary judgment.

---

[6] This was above and beyond the Court's duty in deciding the instant motion. *See, e.g., Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 702 (7th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in the record").

### D. Defamation

The elements of a defamation claim are a false and defamatory statement concerning another, an unprivileged publication to a third party, and fault amounting to at least negligence on the part of the publisher. *Bay View Packing Co. v. Taff*, 543 N.W.2d 522, 529 (Wis. Ct. App. 1995). A defamatory statement is one that "tends to harm one's reputation so as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her." *Mach v. Allison*, 656 N.W.2d 766, 771 (Wis. Ct. App. 2003).

For the reasons already stated, there is no evidence in the record that either Baxter or Keiser made any defamatory statements about Bostwick. Moreover, while Bostwick's amended complaint alleges a defamation claim against Vance, it appears from Bostwick's brief that he has abandoned such a claim.

As for the rest of the defendants, Bostwick points to statements contained in Thompson's Findings and Conclusions (all four versions), as well as the Board's final order terminating Bostwick's employment. The defendants do not dispute that there is evidence in the record suggesting that they knew or should have known that many of the statements contained therein were false. Defendants argue that their statements are protected by absolute privilege because Bostwick's termination hearing qualifies as a

"quasi-judicial" proceeding, but the defendants fail to explain how this is so. *See Vultaggio v. Yasko*, 572 N.W.2d 450, 456 (Wis. 1998) ("the adequacy of procedural safeguards which will minimize the occurrence of defamatory statements is a factor used in many cases to determine whether to grant or withhold absolute privilege"). Defendants also attempt to invoke a conditional privilege, but even if one were applicable here, there is an issue of fact as to whether they abused it. *Zinda v. Louisiana Pacific Corp.*, 440 N.W.2d 548, 553 (Wis. 1989) (privilege may be forfeited "because of the defendant's knowledge or reckless disregard as to the falsity of the defamatory matter").

### E.    Intentional Infliction of Emotional Distress

This  claim has the following elements: (1) the defendant's conduct was intentional; (2) the defendant's conduct was extreme and outrageous; (3) the defendant's conduct caused the injury; and (4) the plaintiff suffered an extreme and disabling emotional response to the conduct. *Alsteen v. Gehl*, 124 N.W.2d 312, 318 (Wis. 1963). The evidence suggests that the defendants engaged in a months-long campaign to ruin Bostwick's career and well-earned reputation. Therefore, the Court agrees that there is sufficient evidence in the record to prove all of these elements – except with respect to Baxter and Keiser, for the reasons already stated.

### F.    Conspiracy

To succeed on a statutory conspiracy claim, Bostwick must prove (1)

that the defendants acted together; (2) with a common purpose to injure the plaintiff's reputation or profession; (3) with malice; and (4) the acts financially injured the plaintiff. Wis. Stat. § 134.01; *Virnich v. Vorwald*, 664 F.3d 206, 213 (7th Cir. 2011).

While this claim was pled against all of the defendants, it appears from reading Bostwick's brief that his conspiracy claim is directed only at Schug and Thompson. The Court agrees that there is enough evidence for a jury to conclude that Schug and Thompson maliciously conspired against Bostwick. *Virnich*, 664 F.3d at 213 (malice in a § 134.01 claim means "doing a harm malevolently for the sake of the harm as an end in itself, and not merely as a means to some further end legitimately desired [such as hurting someone else's business by competition]").

## CONCLUSION

To summarize, the Court finds as follows with respect to Bostwick's claims:

I. <u>Breach of Contract</u>. This claim can proceed to trial against Bostwick's former employer, the Watertown Unified School District.

II. <u>Tortious Interference with Contract</u>. This claim can proceed to trial against Kate Lapin, Cassandra Schug, Ivan Thompson, Paul Vance, and the Board of Education of the Watertown

Unified School District.

III.     <u>Conspiracy</u>. This claim can proceed to trial against Schug and Thompson.

IV.     <u>Defamation (Slander/Libel)</u>. This claim can proceed to trial against Thompson, Schug, Lapin, the School Board, and the School District.

V.     <u>Breach of Fiduciary Duty</u>. This claim can proceed to trial against Vance.

VI.     <u>Intentional and Negligent Misrepresentation</u>. This claim can proceed to trial against Vance.

VII.     <u>Intentional Infliction of Emotional Distress</u>. This claim can proceed to trial against Thompson, Schug, Lapin, Vance, the School Board, and the School District.

VIII.     <u>Section 1983: Procedural Due Process</u>. This claim can proceed to trial against Schug, Thompson and Lapin.

IX.     <u>Section 1983: Equal Protection</u>. Bostwick abandoned this claim.

X.     <u>Age Discrimination and Retaliation (ADEA)</u>. This claim can proceed to trial against Bostwick's former employer, the School District.

XI.     <u>Gender Discrimination (Title VII)</u>. This claim can proceed to trial against Bostwick's former employer, the School District.

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

1.   The defendants' motion for summary judgment is **GRANTED-IN-PART** and **DENIED-IN-PART**, consistent with the foregoing opinion; and

2.   Motions in limine are due to be filed on or before **March 13, 2015**. Responses are due **March 27, 2015**.

Dated at Milwaukee, Wisconsin, this 9th day of February, 2015.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**